[No. B157432. Second Dist., Div. Four. Nov. 14, 2002.]

DANNY EVERETT, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PREMIER PARKS, INC., et al., Real Parties in Interest.

**COUNSEL**

David Greifinger; Howard A. Goldstein; Carlos Mendoza; Esner & Chang and Stuart B. Esner for Petitioner.

No appearance for Respondent.

Prindle, Decker & Amaro, Michael A. Amaro, William M. Hake and Grace C. Mori for Real Parties in Interest.

## Opinion

**EPSTEIN, J.**—Plaintiff claims that the trial court wrongfully granted real parties in interests' motion for summary adjudication as to his cause of action for violation of the Unruh Civil Rights Act, Civil Code section 51 et seq.[1] We agree, grant the writ, and mandate the trial court to vacate the order.

### FACTUAL AND PROCEDURAL SUMMARY

The following factual summary is taken from evidence referenced by petitioner/plaintiff in his separate statement offered in opposition to the summary adjudication motion.

On September 26, 1998, plaintiff Danny Everett, an African-American man, visited Magic Mountain amusement park with his wife Tiarzha Taylor, his sister-in-law Khara Taylor, her daughter Anya Taylor, and her daughter's two friends. After spending a full day at the park, the group decided to make the Colossus roller coaster their last ride. Everett and his sister-in-law went ahead of his wife and the three girls, all under 12 years old, to stand in line at Colossus.

Everett and his sister-in-law were halfway through the line in the Colossus queue house when Tiarzha and the girls arrived. Everett motioned to them and stepped approximately 10 feet out of line to help them join the group. Shortly thereafter, a Magic Mountain employee approached Everett and told him that he was not allowed to cut in line. He said that he did not cut. The guests standing in front of and behind Everett told the employee that he had been in line. Then two other employees approached Everett's wife and took her out of line for questioning. Everett continued to move forward in the queue until he boarded the roller coaster.

Everett was then told to get out of the roller coaster. He did so, and he and his wife were escorted away from the queue house while the rest of the group went on the roller coaster. Everett asked to speak with a supervisor. The supervisor told him that he would have to leave the park for the day because he violated the park's line-cutting policy. Magic Mountain's line cutting-policy provides that " 'Line cutting for the purposes of joining other members of a group or family is generally prohibited, but can be allowed in the following circumstances: (A) the persons(s) trying to enter the line are small children under the age of 12 years and are joining their adult supervision; (B) When one person has left a ticketed line to use the restroom . . . .

---

[1] All further statutory references are to the Civil Code unless otherwise stated.

(E) When the Line Patrol Officer determined that the circumstances for the line cutting are justified and that removing the guests from line would present an unfair hardship to the guests involved.' "

Ten to fifteen seconds after Everett was asked to leave, the girls and Khara exited Colossus. The supervisor then put his open hand on the small of Everett's back and told him to keep moving. Everett asked him to remove his hand and stepped away. Everett then saw a man in a straw hat who could vouch for his presence in line. He attempted to yell to the man, but a supervisor told the security guards to "Get him out of here." A security guard firmly grabbed Everett's arm, and he reacted by pulling it forward to the front of his body to get free. As a result, at least four other security guards jumped on Everett, threw him to the ground, and punched and kicked him. The guards placed Everett under citizen's arrest and chained him to a bench for about two hours while other employees taunted him and directed derogatory statements toward him.

The district attorney filed a criminal complaint against Everett for battering a guard in violation of Penal Code sections 242 and 243, subdivision (a); for trespassing and refusing to leave private property in violation of Penal Code section 602, subdivision (n); and for obstructing or intimidating business operators or customers in violation of Penal Code section 602.1, subdivision (a). A jury acquitted Everett on the battery charge. The jury was unable to reach a verdict on the obstruction or intimidating business operators or customers charge, which ultimately were dismissed.

Danny Everett, Tiarzha Taylor, and Khara Taylor sued Premier Parks, Inc., Six Flags Theme Parks, Inc., Six Flags Magic Mountain, Inc., and six Magic Mountain employees personally for battery, assault, false imprisonment, malicious prosecution, intentional infliction of emotional distress, and violation of the Unruh Civil Rights Act, section 51 et seq. Defendants moved for summary adjudication of Mr. Everett's causes of action for malicious prosecution and violation of the Unruh Civil Rights Act. The court denied the motion as to the malicious prosecution cause of action and granted summary adjudication on the Unruh Civil Rights Act cause of action.

Discussion

I

■ We review the grant of summary adjudication de novo. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 66-67 [99 Cal.Rptr.2d 316, 5 P.3d 874].) When reviewing a summary judgment or summary adjudication ruling, we apply the same legal standard as the trial court. (*California Aviation,*

*Inc. v. Leeds* (1991) 233 Cal.App.3d 724, 731 [284 Cal.Rptr. 687].) If a triable issue of material fact exists, summary adjudication must be denied. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Summary adjudication is a severe remedy and should be used with caution; thus, doubts about the propriety of granting the motion should be resolved in favor of the opposing party. (*Paper Savers, Inc. v. Nacsa* (1996) 51 Cal.App.4th 1090, 1094 [59 Cal.Rptr.2d 547].) In examining the sufficiency of declarations filed in connection with a summary adjudication motion, the declarations of a moving party are strictly construed and those in opposition are liberally construed. (*Ibid.*)

The Unruh Civil Rights Act, section 51, provides in part: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Similarly, section 51.5 mandates that "No business establishment of any kind whatsoever shall discriminate against . . . any person in this state because of the [person's] race, creed, religion, color, national origin . . . ." Finally, section 51.7 of the same act states that "All persons within [California] have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of their race, color, religion, ancestry, national origin . . . ."

█ In opposition to defendants' motion for summary adjudication on the Unruh Civil Rights Act cause of action, plaintiff relied on statistical information that shows African-Americans are more than eight times as likely to be held and removed from the park for line cutting than members of other ethnic groups. He presented evidence that in 1998, 7.5 percent of the park's guests were African-American, but 55.7 percent of the individuals removed from the park for line cutting were African-Americans. In 1997, African-Americans made up 7.2 percent of the guests and 41.3 percent of the people removed from the park for line cutting. During the same years, African-Americans were arrested by the Magic Mountain security force at seven times the combined rate for all other racial groups. Of all the individuals arrested in the park in 1997 and 1998, 35.4 and 49.3 percent, respectively, were African-Americans.

The trial court granted summary adjudication on plaintiffs' cause of action under the Unruh Civil Rights Act, calling the plaintiffs' evidence "speculative." This was error.

In *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873], the Supreme Court held that the introduction

of statistics to prove a disparate impact claim is appropriate when based on the "proper foundation and subject to the general rules of evidence." (*Id.* at p. 1175.) The court reasoned that "[statistical] evidence may be probative of intentional discrimination in some cases, [thus] a blanket rule of exclusion cannot be justified." (*Ibid.*)

Plaintiff correctly argues that courts regularly have employed statistics to support an inference of intentional discrimination. (*Yick Wo v. Hopkins* (1886) 118 U.S. 356, 373-374 [6 S.Ct. 1064, 1072-1073, 30 L.Ed. 220] [200 Chinese individuals denied permits to operate laundry business, but permits granted to 80 of the 81 non-Chinese applicants]; *Castaneda v. Partida* (1977) 430 U.S. 482, 495 [97 S.Ct. 1272, 1280-1281, 51 L.Ed.2d 498] [county population of Mexican-Americans (79.1 percent) twice as large as the percentage of Mexican-Americans summoned for grand jury service (39 percent)]; *Turner v. Fouche* (1970) 396 U.S. 346, 359 [90 S.Ct. 532, 539-540, 24 L.Ed.2d 567] [county population of Black citizens (60 percent) far exceeded the percentage on grand jury lists (37 percent)]; *Whitus v. Georgia* (1967) 385 U.S. 545, 552 [87 S.Ct. 643, 647-648, 17 L.Ed.2d 599] [number of Black citizens on the tax digest (27.1 percent) at least three times the number of Blacks on the grand jury venire (9.1 percent) and the petit jury venire (7.8 percent)].)

Defendants argue that even if statistics are admissible to establish an inference of intentional discrimination, the statistics introduced by plaintiff are inadequate because they lack support from an underlying statistical theory. Under *Harris*, statistical evidence is proper to establish intentional discrimination if the statistics are introduced with "proper foundation and subject to the general rules of evidence." (*Harris v. Capital Growth Investors XIV*, *supra*, 52 Cal.3d at p. 1175.) In some cases, statistical analysis does require an expert. (*People v. Morganti* (1996) 43 Cal.App.4th 643, 668 [50 Cal.Rptr.2d 837] [expert required for statistical analysis of DNA]; *Frazier v. Consolidated Rail Corp.* (D.C. Cir. 1988) 851 F.2d 1447, 1452 [expert required to perform Z test in that circumstance].) All numerical evidence, however, does not mandate an expert witness. (*Yick Wo v. Hopkins*, *supra*, 118 U.S. at pp. 373-374 [6 S.Ct. at pp. 1072-1073]; *Castaneda v. Partida*, *supra*, 430 U.S. at p. 495 [97 S.Ct. at pp. 1280-1281]; *Turner v. Fouche*, *supra*, 396 U.S. at p. 359 [90 S.Ct. at pp. 539-540]; *Whitus v. Georgia*, *supra*, 385 U.S. at p. 552 [87 S.Ct. at pp. 647-648]; *Frazier v. Consolidated Rail Corp.*, *supra*, 851 F.2d at p. 1452 [trial court should determine on case by case basis if expert is required].) Expert testimony is required only for opinions "related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (b).) A simple comparison of percentages does not exceed the

"common experience" of the trier of fact, and hence, does not mandate use of an expert.

Defendants also argue that a statistical analysis would have undermined the plaintiff's numerical argument under the "four-fifths rule" used by the Equal Employment Opportunity Commission, a federal agency. (See 29 C.F.R. § 1607.4D (2002).) Putting aside defendants' failure to provide an expert's declaration explaining why plaintiff's statistical showing is wanting, their assertion fails on a more fundamental ground, as plaintiff correctly points out: they failed to make this showing in the trial court. It is too late to raise it on appeal. (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 8, fn. 2 [74 Cal.Rptr.2d 248, 954 P.2d 511].) We need not consider the argument further.

We conclude the trial court's grant of summary adjudication against plaintiff in his Unruh Civil Rights Act cause of action was improper. Plaintiff presented evidence sufficient to support an inference that Magic Mountain's facially neutral line-cutting policy is applied in a discriminatory manner. Plaintiff has raised a triable issue of material fact on the issue. That is sufficient to defeat this motion for summary adjudication.

#### DISPOSITION

The petition for writ of mandate is granted. Respondent court is directed to vacate its order granting summary adjudication to defendants on plaintiff's Unruh Civil Rights Act cause of action and to enter a new and different order denying this motion. Plaintiff is to have his costs on this appellate review.

Vogel (C. S.), P. J., and Hastings, J., concurred.