Ronald O. LEWIS, Plaintiff,

v.

BOOZ–ALLEN & HAMILTON, INC., Defendant.

No. Civ.A. 99–0713(RMU).

United States District Court, District of Columbia.

June 20, 2001.

Jonathan P. Graham, Williams & Connolly LLP, Washington, DC, for Plaintiff.

Maureen E. Mahoney, Latham & Watkins, Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION *IN LIMINE;* DENYING THE PLAINTIFF'S MOTION TO STRIKE BERNARD SISKIN AS AN EXPERT WITNESS; DENYING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This section 1981 matter comes before the court on three motions: the defendant's motion for summary judgment, the defendant's motion to exclude certain statistical evidence, and the plaintiff's motion to strike Dr. Bernard Siskin as an expert witness. The plaintiff, Ronald O. Lewis ("the plaintiff" or "Mr. Lewis"), brings suit under 42 U.S.C. § 1981, claiming that Booz–Allen & Hamilton ("the defendant" or "Booz–Allen") refused to promote him, fired him, and engaged in unlawful discrimination against him because of his race. Since a motion for summary judgment requires an examination of the entire record, including all pleadings and all admissible evidence,[1] the court will first address the evidentiary motions. Upon consideration of these motions, their supporting documents, and the entire record therein, the court will deny in part and

---

1. *See Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir.1997), *vacated on other grounds by* 156 F.3d 1284 (D.C.Cir.1998) ("the court must consider all the evidence in its full context in deciding whether the plaintiff has met his burden of showing that a reasonable jury could conclude that he had suffered discrimination ...").

grant in part the defendant's motion to exclude statistical evidence. In addition, the court will deny the plaintiff's motion to strike Dr. Bernard Siskin as an expert witness. Lastly, because a genuine issue exists as to a material fact, the court will deny the defendant's motion for summary judgment.

## II. BACKGROUND

Ronald O. Lewis, an African–American man, is an information-technology professional with a bachelor's degree in Engineering and a Master's degree in Industrial Engineering and Operations Research. *See* Am.Compl. ¶ 2. Booz–Allen, a Delaware corporation with its principal place of business in Virginia, is an international management and technology consulting firm with more than 100 offices around the world and more than 9,000 employees. *See* Mot. for Summ.J. at 3; Ans. to Am. Compl. ("Ans.") ¶¶ 2, 3. In 1994, Booz–Allen hired Mr. Lewis, who worked at the company for five years until it fired him in 1999. *See* Am.Compl. ¶¶ 1, 49.

Booz–Allen is divided into two business units: the Worldwide Technology Business ("WTB"), where Mr. Lewis worked, and the Worldwide Commercial Business ("WCB"). *See* Am.Compl. ¶ 6; Mot. for Summ.J. at 3. WTB is divided into five client-service teams, which provide consulting services to government clients. *See id.* Accordingly, Booz–Allen must operate in conformance with both federal laws [2] and its own ethics rules.[3] *See* Mot. for Summ.J. at 4.

In January 1994, Booz–Allen hired Mr. Lewis at a salary of $80,000 to work as a Senior Associate in its Lexington Park, Maryland office. *See* Mot. for Summ.J. at 4, Ex. 9; Pl.'s Opp'n to Mot. for Summ.J. ("Pl.'s Opp'n") at 2. The company considers Senior Associates, Principals and Vice Presidents as management, and lists five criteria for promotion to partnership: business development, client relationship, technical ability, people development, and leadership. *See* Mot. for Summ.J. at 5; Pl.'s Opp'n at 2.

During his first two years at Booz–Allen, Mr. Lewis performed well by all accounts. *See* Mot. for Summ.J. at 5; Pl.'s Opp'n at 11. Despite some concerns about his personnel-management skills, his superiors rated Mr. Lewis's first-year performance as "excellent" or "exceptional" in every category. *See* Mot. for Summ.J. at 5. Mr. Lewis's overall performance earned him a $5,000 raise. *See id.* The following year Booz–Allen promoted Mr. Lewis to Principal and awarded him another $5,000 raise. *See id.*

In his third year, 1996, Mr. Lewis received a $10,000 raise after his first ap-

---

**2.** The False Claims Act, 31 U.S.C. § 3729 *et seq.*, establishes civil liability for knowingly making, using, or causing to be made a "false record or statement to get a false or fraudulent claim paid or approved by the Government." Title 18 U.S.C. § 1001 establishes criminal liability for making "any false, fictitious, or fraudulent statements or representations" to the United States. In addition, Title 48 C.F.R. § 9.406–2 provides that a government official may debar a contractor from future projects for a conviction or civil judgment for committing fraud, making false statements, falsifying records, or committing any other offense that indicates a lack of business integrity.

**3.** Booz–Allen's Code of Ethics states, in pertinent part: "Booz–Allen must ensure that its books and records accurately reflect all transactions of the firm. Therefore, employees must observe the following standards with respect to record keeping and communications: ... Accurately record entries in the firm's books and in any internal or external correspondence of any type; [and] submit accurate documentation in connection with any Government or other contract or proposal." *See* Mot. for Summ.J. at 3–4.

praisal as Principal. *See id.* To enhance his career and obtain access to a broader set of clients, Mr. Lewis requested a transfer to Booz–Allen's main office in McLean, Virginia. *See id.* Mr. Lewis requested the move after noticing what he perceived as a racially discriminatory environment wherein partners charged with the responsibility for mentoring and supporting him did not do so. *See* Pl.'s Opp'n at 4. Booz–Allen granted Mr. Lewis's request for a transfer and he began working at the McLean office in 1996. *See* Mot. for Summ.J. at 6.

The instant case centers on events that took place between January and October of 1997. In January 1997, the United States Air Force awarded the Intelligent Tutoring Systems ("ITS") Program contract to Booz–Allen. *See* Mot. for Summ.J. at 6, Ex. 16. As manager of the performance of the contract, Mr. Lewis handled the bidding on the ITS contract. The original bid submitted to the Air Force involved in-house development of software by Booz–Allen for use by the Air Force. The bid did not mention the possibility of purchasing ready-made software. *See* Pl.'s Opp'n at 26. In a 1997 appraisal, Mr. Lewis's supervisors commended him for the "key win" on the ITS Contract, noting that he had developed a "strong market focus through his leadership." *See* Mot. for Summ.J. at 6, Ex. 19; Pl.'s Opp'n at 12.

While managing the performance of the ITS contract, Mr. Lewis learned of "Nereus," a "commercial off the shelf" ("COTS") product created by Vicom Multimedia, a Canadian company. *See* Pl.'s Opp'n at 25. Nereus is a multimedia publishing system that can be used in the ITS program rather than creating new software. *See* Mot. for Summ.J. at 10; Pl.'s Opp'n at 25. Mr. Lewis conducted negotiations with Vicom Multimedia to purchase the multimedia software and visited Vicom's headquarters in Edmonton, Alberta in May 1997. *See* Pl.'s Opp'n at 25. After Vicom demonstrated the product, Mr. Lewis told Vicom that Booz–Allen would want to use the software on the ITS program if the Air Force approved its use and purchase. *See* Mot. for Summ.J. at 25.

Booz–Allen's original bid to the Air Force did not include the purchase of software. *See* Pl.'s Opp'n at 25–26. Rather, it entailed the in-house development of software for use in the ITS program. *See id.* Between May and August of 1997, Mr. Lewis, along with Jerry Keybl and Brian Padgett, conducted an evaluation of the Nereus software to determine whether it was suitable for the ITS program, and whether Booz–Allen could justify the software purchase to the Air Force. *See* Pl.'s Opp'n at 26. On July 8, 1997, during an in-progress review, Mr. Lewis informed the Air Force of Booz–Allen's intention to use the Nereus software on the ITS program. *See* Mot. for Summ.J. at 26, Ex. 102; Pl.'s Opp'n at Ex. M, Ex. O.

On July 31, 1997, Sharon Hines, Vicom's primary negotiator, sent a letter ("the July 31 letter") to Mr. Lewis concerning the status of negotiations. *See* Mot. for Summ.J. at 9. The July 31 letter was a business "proposal" sent to "outline the framework for an acceptable business relationship," and included a proposal for the scope of the software license, the price of the license, and the length of an evaluation period for the "Pilot Project." *See id.*

On August 7; 1997, at another in-progress review, Booz–Allen formally recommended to the Air Force that it authorize purchase of the Nereus software. *See id.* at 10; Pl.'s Opp'n at 27. On August 28, 1997, Mr. Lewis sent a document entitled "Justification for Purchase of the Nereus Software" "recommending" that the Government utilize the software because it

would save the Government money. *See* Mot. for Summ.J. at 10. The next day, Ms. Hines confirmed in a letter dated August 29 ("the August 29 letter") that the two parties had "work[ed] out the details of a business relationship," which included the potential purchase of the software license. *See id.* at 10. The August 29 letter stated that if the Nereus software passed the 90–day evaluation, Booz–Allen would buy the software license. *See id.* The letter included a Pilot Program Agreement, which stated that the evaluation period would begin on September 15 and end no later than December 15, 1997. *See* Mot. for Summ.J. at 11. On September 22, the government sent written approval to purchase the software. *See id;* Pl.'s Opp'n at 28.

Less than two weeks later, on October 2, 1997, the government issued a "Stop Work" order on the ITS Contract, instructing Booz–Allen to halt work on the project. *See* Mot. for Summ.J., Ex. 20. The government indicated that funding cuts made it necessary to reassess the status of the ITS program. *See id.*

In November 1997, Mr. Lewis began to organize an effort to bid for another Air Force contract called "Trac[2]es."[4] *See* Mot. for Summ.J. at 6; Pl.'s Opp'n at 15. Trac[2]es was a large system-integration project with a contract valued at $300 million over a 10–year time frame. *See* Mot. for Summ.J. at 7; Pl.'s Opp'n at 15. Mr. Lewis served as the project's proposal manager. *See id.*

During this bidding period, Mr. Lewis says he encountered various "forms of dis-crimination," including that (1) Mr. Lewis's manager, Mr. Picarelli, "declined to provide routine support to Lewis" when Mr. Lewis was having trouble keeping his staff billable[5]; (2) Mr. Lewis invited Mr. Picarelli, who did not attend, to a "Red Team" review meeting to critique the proposal and provide input; and (3) Mr. Picarelli did not attend any of the practice sessions for the oral presentation that Mr. Lewis was preparing. *See* Pl.'s Opp'n at 15. Finally, Mr. Picarelli allegedly told Mr. Lewis that he had to win the Trac[2]es or another important contract (known as the "AETC" project) to have a future at Booz–Allen. *See* Pl.'s Opp'n at 15.

In May 1998, Mr. Lewis received another performance appraisal in which he received an overall evaluation of "maintaining."[6] *See* Mot. for Summ.J. at 7. The appraisal detailed the strengths and weaknesses of Mr. Lewis's performance, including that his staff perceived him as: (1) taking credit for his staff's work or successes ("this has generated dissatisfaction"); (2) claiming credit for his client's work; (3) offending the client (resulting in the client's refusal to work with him); and (4) disregarding what other people think is important about a client relationship or issue. *See id.* Mr. Lewis received this appraisal during a counseling session with Mr. Picarelli and Mr. Bollettino, in which they discussed the problems with his performance, including his alleged shortcomings in areas of leadership and people development. *See id.* They suggested he attend leadership counseling. *See id.*

---

**4.** "Trac[2]es" is the name of the Air Force's system for tracking and routing military medical patients worldwide. *See* Mot. for Summ. J., Ex. 24.

**5.** "Billability" refers to the number of hours that an employee can bill to a client project. *See* Pl.'s Opp'n, Ex. I at 45.

**6.** The 1998 appraisal form requested an overall summary report of "declining," "maintaining," or "progressing." *See* Mot. for Summ.J. at 7 n. 4.

After submitting the Trac²es proposal to the Air Force, Mr. Lewis met with a member of Booz–Allen's Board of Directors, Joe Garner, to discuss how he had been treated during the course of the proposal. *See id.* Mr. Garner's response to Lewis was that Booz–Allen had a "tough culture" that "wasn't fore [sic] everybody." *See* Pl.'s Opp'n at 16. Soon after that meeting, in August 1998, the Air Force awarded the contract to Booz–Allen and Mr. Lewis decided to remain at the firm. *See* Pl.'s Opp'n at 16; Mot. for Summ.J. at 7. The company named Mr. Lewis the program manager of the contract. *See* Mot. for Summ.J. at 7.

In October 1998, Brian Padgett, Mr. Lewis's subordinate, resigned and notified Booz–Allen that Mr. Lewis had instructed him to backdate (by 60 days) two separate dates in a document. *See id;* Pl.'s Opp'n at 32. The document in question was the August 29, 1997 letter setting forth the terms of the business relationship between Booz–Allen and Vicom Multimedia concerning the potential purchase of the Nereus software license for use in the ITS contract. *See* Mot. for Summ.J. at 8; Pl.'s Opp'n at 32.

Mr. Padgett later provided Art Fritzon, an IT team Vice President, with supporting documents and information about the backdated document. Mr. Padgett also told Mr. Fritzon that Mr. Lewis had instructed him to obtain a copy of the letter with the changed dates after the Government had issued a stop-work order for the ITS contract. *See* Mot. for Summ.J. at 8; Pl.'s Opp'n at 32. Mr. Fritzon went to see Mr. Lewis about the document at issue. *See* Mot. for Summ.J. at 8; Pl.'s Opp'n at 33. Mr. Lewis admitted that he caused the dates on the documents to be changed for the Termination of Convenience claim being submitted to the government for reimbursement of the ITS contract costs.

*See* Mot. for Summ.J. at 8; Pl.'s Opp'n at 33. Mr. Lewis explained that he had the dates changed in order "to better reflect the reality, that they had in fact, been evaluating the product all summer long, and that changing the dates was a more accurate reflection of what had actually occurred." *See* Pl.'s Opp'n at 33; Mot. for Summ.J. at 15. The primary issue concerned whether Booz–Allen, in fact, evaluated the Nereus software product in July and August 1997, and whether Booz–Allen made a commitment to Vicom to pay it for the ITS license. *See id.*

In accordance with Booz–Allen policies and procedures, Mr. Fritzon referred the matter to the Booz–Allen Law Department for investigation. *See* Mot. for Summ.J. at 8. Ivy Martin, Booz–Allen's Associate General Counsel, conducted an internal investigation. *See id.* As part of that investigation, Ms. Martin wanted to determine whether Mr. Lewis had said truthfully that he had made changes to the August 29, 1997 letter so that it would better reflect reality. *See* Pl.'s Opp'n at 36.

In November 1998, at the same time as the law department conducted its investigation, Booz–Allen partner Elliot Rosen conducted Mr. Lewis's performance appraisal. *See* Mot. for Summ.J. at 17. Based on interviews and input from approximately 30 people, including Vice Presidents, Principals, Senior Associates, Associates, and Administrative Staff, the appraisal was mostly negative. *See id.* Although it contained some positive comments about Mr. Lewis in the areas of intellectual leadership, market development, and client contact, *see id.* at 19, the characterization of Mr. Lewis's negative performance outweighed the cited positive qualities. Mr. Rosen's overall summary concluded that Mr. Lewis's performance fell below the level that the company expected of its Principals. Moreover, he

found that Mr. Lewis's conduct put the firm at "significant risk." *See id.*

On January 11, 1999, Ms. Martin, the Associate General Counsel, concluded that Mr. Lewis: 1) caused documents to be altered for the purpose of submission to the government for payment of a claim and that such alterations had no reasonable relationship to the actual dates of occurrences; 2) failed to inform both the contracts manager responsible for the compilation of the claim, and the Officer–in–Charge who was responsible for certifying the claim that he, the plaintiff, had altered the dates on the letter; and 3) failed to cooperate fully with the Law Department in the course of the investigation, providing misleading statements and refusing to meet with the law department to address its findings. *See id.* at 8–9.

On January 12, 1999, Ms. Martin, Robin Shaffert, IT Team Vice Presidents Rosen and Picarelli, and the Human Resources services manager John Drew met to discuss the Law Department's conclusions regarding Mr. Lewis's conduct. *See id.* at 20. After a full discussion, the IT team Vice Presidents who attended the meeting unanimously decided to fire Mr. Lewis. *See id.*

On January 13, 1999, Mr. Picarelli and Mr. Drew gave Mr. Lewis his termination letter, which stated that the company fired him because of his unprofessional conduct and poor performance. *See id.* Booz–Allen gave Mr. Lewis four months severance pay. *See id.*

On March 23, 1999, Mr. Lewis filed the instant action in this court. On November 5, 1999, he filed an amended complaint. Booz–Allen now seeks to exclude certain statistical analyses performed by Dr. Jonathan L. Walker, the plaintiff's expert. Booz–Allen also moves for summary judgment, and, in support of that motion, Booz–Allen submits an affidavit by Dr.

Bernard Siskin, which the plaintiff seeks to strike.

## III. ANALYSIS

### A. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine what facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. All evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which

that party will bear the ultimate burden of proof at trial." *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton,* 164 F.3d 671, 674 (D.C.Cir.1999). Rather, the nonmoving party "must come forward with specific facts" that would enable a reasonable jury to find in its favor. *See id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted). Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka,* 116 F.3d at 879; *Johnson v. Digital Equip. Corp.,* 836 F.Supp. 14, 18 (D.D.C.1993).

Since a motion for summary judgment requires an examination of the entire record, including all pleadings and all admissible evidence, the court will first address the evidentiary motions. *See Aka v. Washington Hosp. Ctr.,* 116 F.3d 876, 879 (D.C.Cir.1997), *vacated on other grounds by* 156 F.3d 1284 (D.C.Cir.1998).

### B. The Defendant's Motion *in Limine* to Exclude Statistical Evidence

#### 1. Standard for Admission of Statistical Evidence

■ This circuit has held that parties may use statistical evidence to prove disparate-treatment claims in employment-discrimination cases. *See Davis v. Califano,* 613 F.2d 957, 962 (D.C.Cir.1979); *Cook v. Boorstin,* 763 F.2d 1462 (D.C.Cir.1985). "Statistical evidence is merely a form of circumstantial evidence from which an in-ference of discrimination may be drawn." *Davis,* 613 F.2d at 962.

■ Statistical evidence can serve various purposes. For example, the plaintiff may use statistical evidence to establish his prima-facie case of race-based discrimination. *See International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Hazelwood School District,* 433 U.S. at 307–08, 97 S.Ct. 2736. In cases where the alleged racial disparities are less glaring, however, the "evidence must be combined with other evidence to establish the requisite prima-facie case of discrimination." *Robinson v. Sinclair & Valentine, L.P.,* 1993 WL 47293, *1 (N.D.Ill.1993). In addition, a plaintiff may introduce statistical evidence tending to demonstrate a "pattern and practice" of discrimination. *See Cook,* 763 F.2d at 1468. Moreover, once an employer has offered a legitimate, nondiscriminatory reason for the alleged discrimination, a plaintiff may use statistics to prove that the reason is pretextual. *See McDonnell Douglas,* 411 U.S. at 804–805, 93 S.Ct. 1817. On the other hand, a defendant may use statistical evidence to rebut a plaintiff's prima-facie case or to discredit a plaintiff's statistical evidence.

#### 2. Dr. Walker's Analysis

The Supreme Court set forth the test for admissibility of scientific or technical testimony or evidence in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. These cases hold that "any and all scientific testimony or evidence admitted [must be] not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786; *see Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (affirming the trial court's exclusion of "technical" expert testimony due to lack of credibility).

The defendant has moved to exclude certain statistical tests provided by the plaintiff's expert, Dr. Walker, on the grounds that they are "methodologically flawed" and "irrelevant." *See* Defendant's Memorandum of Points and Authorities in Support of its Motion *in Limine* to Exclude Certain Statistical Evidence ("Def.'s Mem.") at 2–3.

■ In discrimination cases, the general standard of relevance under the Federal Rules of Evidence applies. *See Abramson v. American University*, 1988 WL 152020, *1 (D.D.C.1988). Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action, more probable or less probable than it would be without the evidence." In addressing the relevance of evidence used to prove disparate treatment, this circuit has held that the "plaintiffs must show that they were treated differently from other similarly-situated members of a nonprotected class." *See Anderson v. Zubieta*, 180 F.3d 329, 341 (D.C.Cir.1999). Therefore, "statistical data and comparative information concerning an employer's treatment of minorities is relevant evidence in an individual discrimination claim against that employer." *Minority Employees at NASA v. Beggs*, 723 F.2d 958, 961 (D.C.Cir.1983).

The defendant contends that "precedents make plain that statistics have virtually no role to play in a case of this type." *See* Def.'s Mem. at 2. The defendant misreads this circuit's precedents. The D.C. Circuit has held that a plaintiff may use statistical evidence in cases alleging individual disparate treatment. *See Cook*, 763 F.2d at 1469 (holding that the evidence of discrimination against employer's black librarians was relevant to claims of discrimination against its black attorneys); *see Davis*, 613 F.2d at 962; *Minority Employ-*

*ees at NASA*, 723 F.2d at 961; *see Abramson*, 1988 WL 152020 at *1. Therefore, the defendant's contention on this point misses the mark.

■ The defendant also maintains that statistics "should only be admitted in a disparate treatment case when they have a clear and direct bearing on the motivation underlying the challenged employment decision." Def.'s Mem. at 2. The court disagrees with both the standard set forth by the defendant and the defendant's application of the standard for the use of statistics. The standard for relevance is not whether the evidence has a "clear and direct" bearing on a fact of consequence. Rather, it is the Federal Rule of Evidence 401 standard that applies. *See* FED. R.EVID. 401.

■ Moreover, because statistics may serve various purposes in disparate-treatment cases, it is incorrect to limit their use to "only . . . when they have a . . . bearing on the motivation underlying the challenged employment decisions." Def.'s Mem. at 2. In this case, the plaintiff offers Dr. Walker's statistical examinations (the Promotion, Termination, and Workforce Composition Tests) to support his claim of discrimination and "disparate treatment of African–American and other minorities." Pl.'s Opp'n to Def.'s Mot. *in Limine* to Exclude Certain Statistical Evidence and Mem. of Points and Authorities ("Pl.'s Opp'n to Mot. *in Limine* ") at 1. If these examinations would make an inference of discrimination more probable or less probable, the court would deem such evidence relevant. *See* FED.R.EVID. 401.

■ After establishing relevance, the proponent must satisfy the second prong of the *Daubert* test, which requires that the evidence must also be reliable, or trustworthy. *See Daubert*, 509 U.S. at 590 n. 9, 113 S.Ct. 2786. The court determines

reliability on a case-by-case basis. *See Kumho Tire*, 526 U.S. at 158, 119 S.Ct. 1167 ("in assessing the reliability of an engineering expert's testimony, the trial court may consider the *Daubert* factors to the extent relevant, which will depend upon the nature of the issue, the expert's particular expertise, and the subject of his testimony."). Applying the law to the instant case, the court rules that both the "Termination Tests" and the "Workforce Composition Tests" are relevant and reliable.

■ The court, however, agrees with the defendant that the "Promotion Tests" are unreliable and inadmissible. The defendant argues that the "Promotion Tests" are irrelevant and inadmissible because the initial tests contained an error that affected the results. *See* Def.'s Mem. at 8. Dr. Walker conducted the "Promotion Tests" by using data from the defendant's correspondence with the Office of Federal Contract Compliance Programs ("OFCCP"). *See id.* The tests related to promotions to officer positions (Vice President and Principal) and minority representations therein. *See id.* The court recognizes that the defendant's own affirmative-action data is a reliable source from which Dr. Walker conducted his examinations. Dr. Walker conceded, however, that he had erred by analyzing the wrong groups, and that even after Dr. Walker corrected his mistake, he conceded that the results, although "still highly probable," were not "statistically significant" by the standards applied. *See* Def.'s Mem. at 8.

■ Because Dr. Walker's analysis of promotions did not demonstrate statistically significant underrepresentation of minorities for the purposes of raising an inference of discrimination, the court finds that the tests are not relevant under Rule 401. *See* FED.R.EVID. 401. The court will exclude the results because their "proba-

tive value is substantially outweighed by the danger of unfair prejudice." *See* FED. R.EVID. 403.

## C. The Plaintiff's Motion to Strike Bernard R. Siskin as an Expert

■ The court will deny the plaintiff's motion to strike Bernard R. Siskin as an expert. Accordingly, the court will admit the expert affidavit in support of the defendant's motion to exclude statistical evidence.

Federal Rule of Civil Procedure 26(a)(2)(A) states that, "A party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." The defendant rightly points out that this rule does not apply to the current situation. In Plaintiff's Motion to Strike Bernard R. Siskin as a Contingent Testifying Expert, ("Pl.'s Mot. to Strike"), the plaintiff properly noted that the affidavit was submitted well after the discovery cutoff date. *See* Pl.'s Mot. to Strike at 3. The affidavit, however, was provided in support of a motion *in limine* and not as a discovery item in preparation for trial. *See* Defendant's Opposition to Plaintiff's Motion to Strike Bernard R. Siskin ("Def's Opp'n to Mot. to Strike") at 2. Moreover, the defendant identified Dr. Siskin as an expert and submitted the required Rule 26(a)(2)(B) reports well in advance of the discovery cutoff date. Under these circumstances, even if Dr. Siskin's affidavit were not admissible as a supporting document to the motion *in limine*, it may have been admissible as a supplemental report under Rule 26(e)(1). "Federal Rule of Civil Procedure 26(e)(1) specifically requires the supplementation or correction of expert opinions." *Potomac Electric Power Co. v.*

*Electric Motor Supply,* 192 F.R.D. 511, 514 (D.Md.2000).

 The plaintiff objects to the use of a contingent testifying expert. But Federal Rule of Civil Procedure 26(a)(3)(A) sets forth a pretrial disclosure rule that requires parties to provide information for any witness, if not previously provided, "whom the party expects to present and those whom the party may call if the need arises." FED.R.CIV.P. 26(a)(3)(A). The court denies the plaintiff's motion to strike Bernard R. Siskin as a contingent testifying expert and to strike his untimely affidavit.

## D. The Defendant's Motion for Summary Judgment on Section 1981 Discrimination Claim

### 1. *McDonnell Douglas* Test

 A discrimination claim under 42 U.S.C. § 1981 ("section 1981") requires proof of intentional discrimination. *See General Bldg. Contractors Ass'n. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Discriminatory animus may be shown through direct evidence, or with indirect evidence using the burden-shifting structure set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff alleges that the defendant violated certain of his rights protected by section 1981, which provides, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penal-

ties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

 Under section 1981, parties may recover only for purposeful discriminatory treatment. *See Frazier v. Consolidated Rail Corp.,* 851 F.2d 1447, 1449 n. 3 (D.C.Cir.1988) (internal citations omitted). The D.C. Circuit has held that the standards and order of proof in section 1981 cases are identical to those governing Title VII disparate-treatment cases. *See Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1412 n. 7 (D.C.Cir.1988) (citing *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225 (D.C.Cir. 1984)). The plaintiff must allege facts that could support the inference that the defendants *intended* to discriminate. *See Frazier,* 851 F.2d at 1449 n. 3. The Supreme Court has stated that intent is the ultimate issue of fact to be determined in an employment-discrimination suit. *See Pullman–Standard v. Swint,* 456 U.S. 273, 288–89, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

 A court charged with assessing the propriety of summary judgment in a Title VII case must view the plaintiff's evidence through the three-part test set forth in *McDonnell Douglas v. Green* and developed by decisional law in this Circuit. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Frazier,* 851 F.2d at 1449 n. 3. The three-part test requires that the plaintiff:

> first establish a prima facie case of prohibited discrimination. Once [the plaintiff] has done so, the burden then shifts to the employer to articulate legitimate, non-discriminatory reasons for the challenged employment decision. Should the employer succeed in presenting such reasons, the burden then shifts back to

the [plaintiff], who then has an opportunity to discredit the employer's explanation.

*Aka,* 156 F.3d at 1288 (citations omitted).

 The plaintiff, who has the ultimate burden of persuasion, may not offer his own speculations and allegations to refute the employer's legitimate, non-discriminatory reasons for its decisions. *See Brown v. Brody,* 199 F.3d 446, 458 (D.C.Cir.1999); *Carpenter v. Federal Nat'l Mortgage Ass'n,* 165 F.3d 69, 72 (D.C.Cir. 1999). Evidence of pretext that is merely colorable or not significantly probative does not suffice to withstand summary judgment. *See Johnson v. Digital Equip. Corp.,* 836 F.Supp. 14, 18 (D.D.C.1993). The plaintiff cannot, however, merely show that the defendant's proffered reasons for its actions were pretextual. Rather, he must satisfy the trier of fact by a preponderance of the evidence "that [he] has been the victim of intentional discrimination." *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

### 2. The Plaintiff Has Established a Prima–Facie Case of Discrimination

 While McDonnell–Douglas sets forth the requisite elements of a prima-facie case of discrimination in the hiring context, the Supreme Court has stressed that the elements are flexible and must be adapted to the particular facts of the case. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Batson v. Powell,* 912 F.Supp. 565, 573 (D.D.C.1996). To establish a prima-facie case of discrimination under section 1981, the plaintiff must show that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) he was replaced by a member of a nonprotected class of equal or lesser qualifications or that nonmembers of the protected class were treated more favorably. *See McDonnell Douglas,* 411 U.S. at 792, 93 S.Ct. 1817. The plaintiff has met his initial burden. As an African–American, he is a member of a protected class. Since his employer fired him, he clearly suffered an adverse employment action. In addition, the plaintiff has identified other similarly situated non-members who received more favorable treatment despite having violated the Booz–Allen Code of Ethics. The plaintiff points to a 1993 incident in which two white employees engaged in "pervasive" misbilling on EPA contracts by instructing subordinates to bill all their time to the government regardless of whether they were actually working. *See* Pl.'s Opp'n at 43. The allegations resulted in "Booz–Allen's 1993 guilty plea to two criminal counts of filing false claims with the government." *Id.* The defendant also paid $1,000,000 in fines plus restitution to the government. *See id.* Moreover, the severity of the allegations caused the EPA to attempt to debar the two white employees. Both employees still work at Booz–Allen. *See id.* at 44. The court deems this sufficient evidence to establish that the company may have treated other similarly situated non-members of a protected group differently from Mr. Lewis. Accordingly, the court finds that the plaintiff has satisfied its burden of establishing a prima-facie case.

### 3. The Defendant Has Met its Burden to Articulate a Legitimate Non–Discriminatory Reason for the Plaintiff's Termination

 Once the plaintiff has established its prima-facie case, the burden shifts to

the defendant to articulate a legitimate non-discriminatory reason for having terminated the plaintiff. In an attempt to meet its burden, the defendant argues that its treatment and discharge of the plaintiff was a rational business decision motivated and justified by the plaintiff's "unprofessional conduct" and "poor performance," rather than by racial animus. *See* Defendant's Statement of Material Facts as to Which There is No Genuine Issue ("Def.'s Mat. Facts") at 16.

The defendant points to the Law Department's conclusion that the plaintiff intentionally caused a document to be backdated, thereby rendering it false, in clear violation of the Booz–Allen Code of Ethics. *See* Mot. for Summ.J. at 13, 15; Def.'s Mat. Facts at 11. Moreover, the defendant explains that it made its decision to fire the plaintiff because of his "poor performance," which was exhibited by his violation of the Booz–Allen Code of Ethics, and his conduct in the workplace. The defendant contends that these reasons amount to legitimate and nondiscriminatory factors. *See id.* The court agrees with the defendant's conclusion that such actions may be proper nondiscriminatory reasons for an employer to take action against an employee.

**4. The Plaintiff Has Raised Genuine Issues of Material Fact that Would Allow a Jury to Infer Discrimination**

 Once an employer has met its burden of advancing a nondiscriminatory reason for its actions, the focus of proceedings at summary judgment:

> will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

*Aka,* 156 F.3d at 1289. In his opposition to the motion for summary judgment, the plaintiff seeks to show that the defendant's explanations for firing him were pretextual and based on racial animus. Based on the record before the court, Mr. Lewis has succeeded in rebutting the defendant's nondiscriminatory reasons for his termination by providing other such circumstantial evidence, including the statistical evidence provided by the plaintiff's expert, that would allow an inference of discriminatory intent on the defendant's part.

The plaintiff has presented circumstantial evidence that his 1999 performance appraisal was unfair since the partner assigned to conduct the appraisal, Elliot Rosen, focused on subjective impressions by individuals who worked for Mr. Picarelli and Ms. Doria, while ignoring the comments made by those who worked on the plaintiff's project. *See* Mot. for Summ.J. at 18–19. Moreover, white employees, all of whom are also subject to the Code of Ethics, were not ultimately discharged for offenses allegedly similar to those committed by the plaintiff. *See* Pl.'s Opp'n at 42–45. Specifically, the plaintiff points to the employees who lied to the government in connection with the withdrawal of the Nereus claim from the Termination for Convenience submission. "Booz–Allen imposed no discipline at all on its own employees (Skanse, Salzano, and Fritzon) who know-

ingly deceived the government about the very matters at issue." Pl.'s Opp'n at 43.

In sum, while the plaintiff admits that he caused the documents to be backdated, *see* Mot. for Summ.J. at 9; Pl.'s Opp'n at 36, he says he backdated the documents to make them accurate, not false. *See* Mot. for Summ.J. at 36. The plaintiff has demonstrated a genuine dispute as to a material fact, namely, whether his performance provided a legitimate, nondiscriminatory basis for Booz–Allen to discharge him. *See* FED.R.CIV.P. 56. The plaintiff has pointed to specific facts in the pleadings, declarations, and other evidentiary matter that, if proven, could lead the fact finder to infer discriminatory purpose. Because the plaintiff has raised a genuine issue as to a material fact, the court will deny the defendant's motion for summary judgment.

## IV. CONCLUSION

For all of these reasons, the court grants in part and denies in part the defendant's motion *in limine* to exclude certain statistical evidence. The court also denies the plaintiff's motion to strike Bernard Siskin as an expert witness. Lastly, because the plaintiff has raised a genuine issue as to a material fact, the court will deny the defendant's motion for summary judgment. An Order directing the parties in a fashion consistent with this Memorandum Opinion was previously issued.